# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ROBERT LEE MICHAEL BATES,<br><br>    Defendant. | Case No. 22-cr-39-CJW-4<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

## I. INTRODUCTION

On December 14, 2022, in a Superseding Indictment, the Grand Jury charged Defendant Robert Lee Michael Bates ("Defendant") with one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), (b)(1)(A), and 846. (Doc. 317.)

The matter before the Court is Defendant Bates's motion to suppress. (Doc. 246). The Government timely filed a response. (Doc. 269.) Defendant timely filed a supplemental brief. (Doc. 304.) The Government timely filed a response to the supplemental brief. (Doc. 308.) The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on Monday, December 5, 2022. (Doc. 296.)

The motion arises from an interview between Defendant and law enforcement on March 29, 2021. The issue presented is whether Defendant's statements to law enforcement were voluntary and whether Defendant's statements were obtained as a result of an unlawful custodial interrogation.

1

At the hearing, the following Government exhibits were admitted without objection:

1. May 21, 2021 Wiretap Affidavit;
11. Supplemental Dept. of Corrections Complaint Report dated March 21, 2021; and
12. Email chain between State of Iowa Probation Officer Mark Smith and Marion Police Department Officer Jeff Gilson dated March 23-24, 2021.

Defendant Bates submitted an Inventory of Items to be suppressed. (Doc. 246 at 3.) At the hearing, the following defense exhibits were admitted without objection:

A. "False Confessions . . ." article;
C. Emails between Probation Officer Smith and Investigator Gilson dated March 23 and 24, 2021;
D. Text messages between Officer Smith and Defendant dated March 25, 2021;
E. Text messages between Officer Smith and Gilson dated March 25, 2021;
F. Text messages between Officer Smith and Defendant dated April 12, 2021;
G. Supplemental Complaint Report signed by Officer Smith dated June 27, 2022;
H. Report of Investigation signed by Investigator Gilson dated March 10, 2022;
I. Portions of Defendant's detention hearing transcript on May 19, 2022 - Officer Meggers testimony;
K. United States Department of Justice Policy Concerning Electronic Recording of Statements dated May 12, 2014; and
L. "Revealing Incommunicado . . ." article.

The Government called four witnesses: Probation Officer Mark Smith; City of Marion Police Investigator Jeff Gilson, currently assigned to the DEA Task Force; Adam Cirkl; and Cedar Rapids Police Officer Bryan Furman, currently assigned to the DEA

2

Task Force. I found all four witnesses credible. For the following reasons, I respectfully recommend that the District Court deny Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

### A. Defendant's State Supervision

Mark Smith, State Probation/Parole Officer for Iowa's Sixth Judicial District Department of Correctional Services, began directly supervising Defendant in February 2021.[1] According to Officer Smith, Defendant was on probation for five different cases, assault causing bodily injury, domestic abuse, criminal mischief, possession of a controlled substance, and harassment. (Smith Hr'g Test. at 8.) Shortly before Officer Smith started supervising him, Defendant was arrested for eluding and possession of a controlled substance. When Defendant was previously being supervised by a different probation officer, Defendant had a history of missing office appointments, using drugs, and failing to follow through on drug treatment.

After Officer Smith began supervising him, Defendant continued to use drugs. Defendant also continued to not attend drug treatment. Furthermore, at the time Officer Smith took over Defendant's supervision, Defendant had a probation revocation hearing scheduled to address prior violations. The scheduled revocation hearing would also address the new eluding and possession charges and the continuing violations that were occurring under Officer Smith's supervision, relating to Defendant's continued drug use and failure to attend drug treatment.

On March 22, 2021, during an office visit with Officer Smith, Defendant admitted using drugs and failing to follow through on drug treatment. Officer Smith told

---

[1] Officer Smith has been a Department of Corrections probation officer for 18 years, and, for the past 13 years has been a member of the department's high risk unit. Officer Smith explained that a high risk or violent offender is generally an individual who has a history of violent behavior or an individual who participates in ongoing criminal conduct in the community while on probation or parole.

Defendant that he was not comfortable leaving him in the community with ongoing violations and pending charges and intended to take him into custody. (*Id.* at 11.) Defendant informed Officer Smith that he did not want to go to jail. Officer Smith told Defendant that his options for not being taken into custody were to: (1) remain clean and sober; (2) get a substance abuse evaluation; and (3) if willing, talk to law enforcement regarding drug activity in the community. (*Id.* at 12.) Officer Smith and Defendant also discussed that, absent his cooperation with law enforcement and staying clean and sober, at the revocation hearing, Defendant was looking at a contempt to discharge, meaning he would have to spend some days in jail before being discharged. (*Id.* at 13.) Officer Smith told Defendant that, if he followed through with the three conditions outlined above, Officer Smith would let him continue his probation in the community and Officer Smith would give him a more favorable recommendation at the revocation hearing.[2] (*Id.* at 13-14.) When asked whether he promised Defendant a specific recommendation at the revocation hearing, Officer Smith responded, "No numbers. I just said it would be, like, more favorable. I mean, we never discussed numbers or anything, I don't think." (*Id.* at 14.)

Because Defendant told Officer Smith that he was willing to talk to someone regarding his drug purchasing, Officer Smith contacted Marion Police Investigator Jeff Gilson.[3] Officer Smith explained that he reached out to Investigator Gilson because Defendant told him that he was purchasing drugs from someone in Marion, Iowa. Investigator Gilson agreed to meet with Defendant and Officer Smith because Defendant

---

[2] Officer Smith explained that, at a revocation hearing, the prosecutor typically would ask the probation officer for a sentencing recommendation should a defendant be found in violation. Officer Smith indicated that the probation officer makes a recommendation to the court and prosecutor and then they could do whatever they wanted to do with the recommendation.

[3] Investigator Gilson began employment with the Marion Police Department in 2006 as a police officer. He has been an investigator since 2017. In January 2022, Investigator Gilson was assigned to the DEA as a Task Force Officer.

4

had information about possible drug dealing in Marion. At the time Officer Smith reached out to him, Investigator Gilson did not have an ongoing investigation into Defendant, had never investigated Defendant, had never arrested Defendant, and had no knowledge concerning Defendant's criminal background.

On March 25, 2021, Officer Smith, Investigator Gilson, and Defendant met at the probation office. The meeting took place in an open conference room. Defendant was not placed in handcuffs for the meeting. Officer Smith indicated that he likely had his full uniform on, including his duty belt. According to Officer Smith, the meeting lasted approximately 20 minutes. Officer Smith described the meeting as laid back, involving and open conversation with Defendant regarding his knowledge of drug-dealing activity in Marion. (*Id.* at 20.) Investigator Gilson described the meeting as a "meet and greet." (Gilson Hr'g Test. at 43.) Investigator Gilson indicated that they briefly discussed an individual who may have been selling some pills and marijuana in Marion. (*Id.*) When asked whether he made any promises regarding the resolution of Defendant's case or pending probation violations, Officer Smith responded, "I was like, hey, if you are willing to cooperate and do this, I'll give you a favorable recommendation. That's the probation office. That's—I kind of just stuck with the probation. I didn't say anything about any pending charges or nothing like that." (Smith Hr'g Test. at 20.) Officer Smith noted that toward the end of the meeting, Defendant and Investigator Gilson arranged a follow-up meeting for later that afternoon. Officer Smith told Defendant that he would follow up with him at their probation appointment the following week. Defendant then left the probation office.

Later, on March 25, 2021, Officer Smith texted Defendant inquiring whether he had met with Investigator Gilson that afternoon. On March 26, 2021, Defendant responded to Officer Smith's March 25, 2021 text and Officer Smith and Defendant had the following text exchange:

5

> [Defendant:] No I didn't have time to stop out in Marion. I'm going to get a hold of him[.]
> [Officer Smith:] Call him now and get a meeting set up. Your window to help your situation is closing quickly. Remember I'm allowing you to stay in the community pending your willingness to help out. If you don't want to that is fine too, but you lose the ability to help yourself. You have 10 minutes to call him.
> [Defendant:] W[h]ats his number[?] I'm looking find his card[.]
> [Officer Smith:] XXX-XXX-XXXX. He called and texted u several times yesterday. Text me the time of your meeting so I know you got a hold of him.
> [Defendant:] I'm texting him now[.]
> [Officer Smith:] When is your meeting with him?
> [Defendant:] Monday.
> [Officer Smith:] Cool. If you choose not to meet with him Monday, then I know you have chosen not to help your situation and we can talk about that Monday night at your meeting with me in the office.
> [Defendant:] So if I don't work with him I AM going to jail[?] I already set up the appointment to meet with him Monday [at] 11:30[.] Is that w[h]at u mean[?]
> [Officer Smith:] I thought the meeting is at 10am. Better double check. If you don't want to do it we[']ll discuss other options.
> [Defendant:] Ok ur right it's 10[.]

(Defendant's Exhibit D.) When asked about this text exchange, Officer Smith indicated that, because he had probable cause to arrest Defendant for probation violations and Defendant wanted to remain in the community, he was trying to help Defendant and let him remain in the community by asking him to stop doing drugs, obtain a drug abuse evaluation, and cooperate with law enforcement regarding drug activity involving pills in Marion. (Smith Hr'g Test. at 32-33.) Further, Officer Smith indicated that, if Defendant did these things, he would give Defendant a favorable recommendation at the revocation hearing. Officer Smith stated, "And at that time, it was—everything was just to help him out. I had no idea this would ever come about." (*Id.* at 33.) Officer Smith also noted that Defendant had a history of not following through and that the purpose of the text

6

exchange was to check in with Defendant and encourage him to follow through and meet deadlines before the scheduled revocation hearing.

Officer Smith testified that, prior to the revocation hearing in April 2021, per Defendant's own report, he stopped using drugs, attempted but apparently did not attend the substance abuse evaluation, and provided only minimal cooperation with law enforcement. (*Id.* at 23-24.) Nevertheless, Officer Smith gave Defendant a favorable recommendation at the revocation hearing.

### B.     *March 29, 2021 Meeting at the Marion Police Department*

On March 29, 2021, Defendant met with Investigator Gilson at the Marion Police Department.[4] Defendant, Investigator Gilson, and former DEA Task Force Officer Adam Cirkl were present at the meeting.[5] Investigator Gilson stated that he included Officer Cirkl in the meeting to assist him with the interview. (Gilson Hr'g Test. at 45.) The interview took place in the Marion Police Department investigations conference room. The door to the conference room was closed for privacy. Before the interview started, Investigator Gilson informed Defendant that he was free to leave at any time. (*Id.* at 47-48.) During the interview, Defendant and the law enforcement officers discussed an individual living in Marion who was selling ecstasy pills and marijuana. Defendant also mentioned an individual, who he referred to as "Blood," that was selling methamphetamine in Cedar Rapids. Officer Cirkl noted that, generally, Defendant was not anxious or nervous during the interview, but when Defendant started talking about

---

[4] Investigator Gilson requested Defendant meet with him but made no demands on Defendant that he attend the meeting. (Gilson Hr'g Test. at 44.)

[5] At the time of the March 29, 2021 meeting, Mr. Cirkl was a DEA Task Force Officer and employed as a police officer with the City of Marion. Mr. Cirkl was a Marion police officer for approximately 11 years, and for the last four of those years was assigned to the DEA Task Force. He ended his employment with the Marion Police Department in August 2021. Currently, he owns his own real estate and construction business.

7

"Blood" he became a little nervous and looked down while talking. (Cirkl Hr'g Test. at 82.)

Within a couple days of the March 29, 2021 interview, Investigator Gilson provided DEA Task Force Officer Bryan Furman with the information that Defendant provided regarding "Blood." According to Investigator Gilson, Officer Cirkl recognized the name "Blood" and told Investigator Gilson that Officer Furman would be interested in that information, as it related to a case he was investigating. (Gilson Hr'g Test. at 52-53.) Officer Cirkl also contacted Officer Furman regarding the name "Blood" coming up in the interview with Defendant. According to Officer Cirkl, he recognized the name "Blood," but did not know much about him. (Cirkl Hr'g Test. at 83.) Officer Cirkl was also aware, at that time, that Officer Furman had an active investigation into "Blood." (*Id.*) At the end of the interview, Defendant left the police department.

### III. DISCUSSION

#### A. *The Parties' Arguments*

Defendant argues that his statements to law enforcement on March 29, 2021 should be suppressed because they were not voluntary and were coerced by promises of leniency and threats of being jailed in violation the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966). (Doc. 246-1 at 4-7.) Specifically, Defendant argues that he was "promised the benefits of a lighter sentence on his state case, that he would not be jailed if he cooperated, and that his words would not be used against him."[6] (*Id.* at 5.) Defendant also asserts that he was "threatened that if he did not cooperate, he would be jailed and face a harsher punishment." (*Id.*)

---

[6] While Defendant states that he was promised that "his words would not be used against him," Defendant does not develop this argument in either his brief or his supplemental brief. Moreover, there is no evidence in the record before the Court that Defendant was ever promised that his words would not be used against him. Accordingly, I will not address this issue further.

In supplemental briefing, Defendant argues that his "un-*Mirandized* statements from Ma[rch] 29, 2021, should be suppressed because he was subjected to a custodial interrogation" and his statements were not voluntary. (Doc. 304 at 2.) Defendant contends that the interview was custodial because it took place in a police-dominated atmosphere. (*Id.* at 4-5.) Defendant also argues that the use of his statements is "fundamentally unfair because no record of the interaction was made by anyone that was there in-person until almost a year later." (*Id.* at 9.)

The Government argues that the interview on March 29, 2021 was not in violation of *Miranda* because Defendant was not in custody at the time of the interview. (Doc. 273 at 44-46; Doc. 308 at 1-5.) The Government also argues that Defendant's statements were voluntary. (Doc. 308 at 5-10.)

**B.    Relevant Law**

"The familiar *Miranda* rule provides as a general matter that investigators must communicate warnings to a suspect before conducting a custodial interrogation." *United States v. Armstrong*, 39 F.4th 1053, 1056 (8th Cir. 2022). "*Miranda* warnings are required only when a person is in custody, because they are intended to 'protect the individual against the coercive nature of custodial interrogation.'" *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (quoting *United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011), in turn quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)). "A person is considered to be in custody for the purposes of *Miranda* warnings when there is a 'formal arrest or restraint [on his or her] freedom of movement of the degree associated with formal arrest.'" *United States v. Sandell*, 27 F. 4th 625, 628-29 (8th Cir. 2022) (quoting *United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021)).

In determining whether a person is in custody, courts consider: "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances,

9

would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Unites States v. Mshihiri*, 816 F.3d 997, 1003 (8th Cir. 2016) (alteration in original) (quotation omitted). In making this determination, the Eighth Circuit Court of Appeals has held that courts should consider the following six factors:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "While the foregoing list is decidedly non-exhaustive, the presence or absence of these particular indicia of custody have been influential in this court's assessment of the totality of the circumstances surrounding an official interrogation." *Id*.

"A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Sandell*, 27 F.4th at 630 (quoting *United States v. Roberts*, 975 F.3d 709, 718 (8th Cir. 2020)). In determining whether a defendant's will has been overborne, courts examine the totality of the circumstances, "'including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.'" *Id*. (quoting *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021)). Factors for making this determination include "'the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.'"

10

Case 1:22-cr-00039-CJW-MAR    Document 368    Filed 01/23/23    Page 10 of 19

*Magallon*, 984 F.3d at 1284 (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)).

### C. *Analysis*

I find that, on March 29, 2021, when Defendant spoke with Investigator Gilson and Office Cirkl, Defendant was not in custody for purposes of *Miranda*. I have considered the *Griffin* factors and make the following findings. First, while Investigator Gilson and Officer Cirkl did not explicitly state that the meeting with Defendant was voluntary or that Defendant was not under arrest, it is clear from the record before the Court that the meeting was voluntary, Defendant was free to leave, and Defendant was not under arrest. Indeed, Defendant was not arrested on March 29, 2021, and, during the meeting, Investigator Gilson informed Defendant that he was free to leave at any time. (Gilson Hr'g Test. at 47-48.) *See United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009) ("An 'explicit assertion that the defendant may end the encounter . . . generally removes any custodial trappings from the questioning.'") (quoting *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006)).

Further, Investigator Gilson requested Defendant's presence on March 29, 2021 to discuss drug activities in Marion, but did not demand Defendant's presence on March 29, 2021. (Gilson Hr'g Test. at 44.) The record demonstrates that, prior to the March 29, 2021 meeting, Defendant had agreed to cooperate with law enforcement and talk to law enforcement regarding drug activities in Marion. (Smith Hr'g Test. at 12.)

To understand Defendant's decision to cooperate with law enforcement, I will set out, in detail, the background relevant to Defendant agreeing to cooperate with law enforcement. On March 22, 2021, Officer Smith, Defendant's probation officer, informed Defendant that, based on Defendant's pending charges, Defendant's continued use of drugs, and Defendant's failure to attend drug treatment, he intended to take him into custody. (*Id*. at 11.) Defendant did not want to go into custody and Officer Smith

11

agreed to allow Defendant to remain in the community on probation, if (1) he stopped using drugs, (2) agreed to attend a drug evaluation, and (3) agreed to talk to law enforcement regarding drug activity in Marion. (*Id.* at 11-12.) Officer Smith indicated that, if Defendant complied with these three conditions, Defendant could stay in the community and Officer Smith would give him a favorable recommendation at Defendant's upcoming revocation hearing. (*Id.* at 13-14.) On March 25, 2021, Officer Smith, Defendant, and Investigator Gilson met at the probation office. Officer Smith introduced Defendant to Investigator Gilson and ultimately Defendant agreed to meet with Investigator Gilson again. (*Id.* at 19-21.)

Later, on March 25, 2021, Officer Smith followed up with Defendant via text message to see if he had scheduled a meeting with Investigator Gilson. Defendant responded to Officer Smith that he had not talked with Investigator Gilson. Officer Smith texted the following to Defendant:

> Call him now and get a meeting set up. Your window to help your situation is closing quickly. Remember I'm allowing you to stay in the community pending your willingness to help out. If you don't want to that is fine too, but you lose the ability to help yourself. You have 10 minutes to call him.

(Defendant's Exhibit D.) Defendant responded that he had meeting set up for Monday, March 29, 2021 with Investigator Gilson. Officer Smith texted, "Cool. If you choose not to meet with him Monday, then I know you have chosen not to help your situation and we can talk about that Monday night at your meeting with me in the office." (*Id.*) Officer Smith testified that the purpose of the text messages was two-fold: (1) he was trying to help Defendant obtain a better recommendation at the upcoming revocation hearing; and (2) he was urging Defendant to follow through with setting up a meeting with Investigator Gilson because Defendant had a history of not following through on things. (Smith Hr'g Test. at 33.)

On March 29, 2021, when Defendant met with Investigator Gilson and Officer Cirkl at the Marion Police Department, Investigator Gilson testified he believed that Defendant was meeting them to receive help on his probation revocation. (Gilson Hr'g Test. at 45.) At the time they met, neither Investigator Gilson nor Officer Cirkl had any ongoing investigation into Defendant. (*Id.* at 46; Cirkl Hr'g Test. at 77.) Investigator Gilson stated that he was not seeking evidence against Defendant for a future charge. (Gilson Hr'g Test. at 46.) Defendant arrived at the Marion Police Department on his own. (*Id.*)

Later, in April 2021, Officer Smith gave Defendant a favorable recommendation at his probation revocation hearing. (Smith Hr'g Test. at 24.) Officer Smith noted that, prior to the revocation hearing, per Defendant's own report, he stopped using drugs, attempted but apparently did not attend the substance abuse evaluation, and provided minimal cooperation with law enforcement. (*Id.* at 23-24.)

Based on the foregoing facts: (1) Defendant was not under investigation at the time of the March 29, 2021 interview; (2) Investigator Gilson requested Defendant's presence at the Marion Police Department to discuss drug activity in Marion primarily to allow Defendant to help himself with his pending probation revocation hearing; (3) Officer Smith urged Defendant to meet with Investigator Gilson to help him with his pending probation revocation hearing and because Defendant had a history of not following through on things; (4) Defendant set up the meeting with Investigator Gilson on March 26, 2021 and went to the meeting on his own on March 29, 2021; and (5) Defendant received a favorable recommendation from Officer Smith at his probation revocation hearing for, among other things, his cooperation with law enforcement even though it was minimal. Under these circumstances, I find that the interview with Defendant was voluntary, or in the least, Defendant voluntarily acquiesced to attend the March 29, 2021 meeting at the Marion Police Department. *See United States v. Axom*, 289 F.3d 496,

13

500-501 (8th Cir. 2002) (providing that voluntary acquiescence is a mitigating factor against custody).

Second, Defendant possessed unrestrained freedom of movement during the interview. Inside the police conference room, where the interview was held, Defendant remained unrestrained and the door to the room remained unlocked. (Gilson Hr'g Test. at 48.) Investigator Gilson told Defendant that he was free to leave at any time and the door was unlocked. (*Id.*)

Third, as discussed above, Investigator Gilson requested Defendant to come to the Marion Police Department to talk with him, Defendant arranged the date and time for the interview with Investigator Gilson, and Defendant went to the Marion Police Department on his own accord. At the time of the interview Defendant was not under investigation. During the interview, neither Investigator Gilson nor Officer Cirkl discussed anything regarding Defendant's pending probation revocation hearing. (*Id.*; Cirkl's Hr'g Test. at 80.) Thus, the circumstances support a finding that Defendant voluntarily acquiesced to the interview.

Fourth, based on the record before the Court, there is no evidence that either Investigator Gilson or Officer Cirkl employed strongarm tactics or deception with Defendant. Further, Defendant was free to end the conversation and leave the interview room at any point during the interview, but he did not.

Fifth, the interaction between Defendant and Investigator Gilson and Officer Cirkl occurred at the Marion Police Department. Investigator Gilson did not recall whether his firearm was visible or whether Officer Cirkl's firearm was visible during the interview. (Gilson's Hr'g Test. at 47.) Officer Cirkl could not recall whether his firearm was visible during the interview but indicated that as a DEA Task Force Officer his firearm was generally concealed carry. (Cirkl's Hr'g Test. at 79.) "*Miranda* warnings are not required simply because the questioning takes place in the station house, or

14

because the questioned person is one whom the police suspect." *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *see also Griffin*, 922 F.2d at 1352 ("The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the investigation was police dominated."); *see also Elzahabi*, 557 F.3d at 884 ("Where there is no clear indication that the defendant's freedom to depart is restricted, a police station interview is non-custodial.").

Sixth, Defendant was not placed under arrest at the end of the questioning and was allowed to leave.

Based on the totality of the circumstances, I find that the meeting and conversation involving Defendant, Investigator Gilson, and Officer Cirkl was not a custodial interrogation subject to *Miranda* warnings.

Although I have determined that March 29, 2021 meeting was non-custodial, I will address Defendant reliance on *United States v. Ollie*, 442 F.3d 1135 (8th Cir. 2006). Defendant cites *Ollie* as support for his primary contention that Officer Smith's prodding and March 26, 2021 text message directing Defendant to contact Investigator Gilson and set up the meeting was coercive and made Defendant's decision to go to the Marion Police Department on March 29, 2021 involuntary. (Doc. 304 at 3-6.) In *Ollie*, the defendant was ordered by his parole officer to talk to law enforcement and told that if the defendant refused to speak with law enforcement it would be a parole violation. 442 F.3d at 1138. Further, the Eighth Circuit noted that it was difficult to determine whether the defendant had freedom of movement in the interview room and law enforcement used deceptive tactics during the interview. *Id.* at 1138-39. The Eighth Circuit also found that a reasonable person in the defendant's position "could think that any attempt to terminate the interview could result in a revocation of his parole." *Id.* at 1140.

15

This case is distinguishable from *Ollie*. First, Officer Smith's purpose in encouraging Defendant to cooperate with law enforcement, which Defendant indicated he was willing to do, was to benefit Defendant, which it did. There is no evidence to support the supposition that Officer Smith had any interest or involvement in the investigation into Marion drug activity or into "Blood." Officer Smith did not arrest Defendant prior to his revocation hearing and Officer Smith gave Defendant a favorable recommendation at his revocation hearing. Officer Smith also did not order Defendant to meet with Investigator Gilson or indicate that a failure to meet with Investigator Gilson would constitute a probation violation. Further, as discussed above, Defendant set up the meeting with Investigator Gilson on March 26, 2021 and went to the meeting on March 29, 2021 on his own accord. On March 29, 2021, at the interview, Defendant's freedom of movement was not impeded, no deceptive police tactics were used, Defendant was not under investigation, and Defendant's pending revocation hearing was not discussed or considered. Based on the foregoing circumstances, I find that *Ollie* is distinguishable and Defendant's reliance on *Ollie* is misplaced.

I also find that Defendant's statements were voluntary. Here, there is no evidence of police coercion. Officer Smith did not participate other than to encourage Defendant to attend the meeting. There is no evidence that Investigator Gilson or Officer Cirkl extracted information from Defendant using threats, violence, or promises. *See Sandell*, 27 F.4th at 630. The interview was not coercive, and the length of the interrogation was relatively short (approximately thirty minutes). While the conversation took place at the Marion Police Department, this factor does not weigh heavily against the voluntariness of the meeting and conversation for the reasons discussed above. There is no evidence of Defendant being physically or mentally impaired or lacking the requisite maturity for the meeting and interview to be voluntary. *See Magallon*, 984 F.3d at 1284. Therefore,

based on the totality of the circumstances, I find that Defendant's meeting and interview with Investigator Gilson and Officer Cirkl on March 29, 2021 was voluntary.

Finally, I will address Defendant's contention that the use of Defendant's "alleged statements is fundamentally unfair because no record of the interaction was made by anyone that was there in-person until almost a year later." (Doc. 304 at 9.) Defendant also complains that Officer Furman's affidavits conflict with Investigator Gilson's March 2022 report. (*Id.*) Specifically, Defendant points out that, in the affidavits, Officer Furman noted that Defendant spoke to Investigator Gilson on March 29, 2021 to avoid being arrested and was hesitant when talking about "Blood." (*Id.*) Defendant also cites several cases[7] which apparently, he believes support his contention that law enforcement's failure to record the March 29, 2021 interview is grounds for suppression. (*Id.* at 9-13.)

I am unpersuaded by Defendant's argument. First, even in a custodial interrogation (which the instant case was not), "the Constitution does not mandate electronically recording a defendant's custodial interrogation." *United States v. French*, 719 F.3d 1002, 1007 (8th Cir. 2013) (citing *United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005)). Second, Investigator Gilson explained that when talking with an individual who is cooperating with law enforcement in a non-custodial interview, the Marion Police Department does not generally record such conversations. (Gilson Hr'g Test. at 50.) Third, the cases cited by Defendant are inapplicable. In *United States v. Azure*, No. CR-99-30077, 1999 WL 33218402 (D.S.D. Oct. 19, 1999), the district court admonished the F.B.I. for refusing to record a two-hour interview with a suspect where he confessed to a crime. *Id.* at *1-*2. Nevertheless, the district court adopted the report and recommendation which recommended that the motion to suppress be denied. *Id.* at

---

[7] Defendant also cites a transcript from a 2011 Northern District of Ohio case, which Defendant obtained from a website. (Doc. 304 at 11-12.) The transcript is not binding on the Court and I do not intend to address it further.

17

*2. In *United States v. Plummer*, 118 F.Supp.2d 945 (N.D. Iowa 2000), the district court granted a motion to suppress, finding that the defendant invoked his right to remain silent and law enforcement did not honor that right. *Id*. at 953-54. While the district court admonished law enforcement for not recording the interview, particularly where four law enforcement officers gave conflicting testimony, *Plummer* does not stand for the proposition that failure to record a non-custodial interview is grounds for suppression. Similarly, *United States v. Mansker*, 240 F.Supp.2d 902 (N.D. Iowa 2003) is distinguishable from the present case. In *Mansker* the court did not address a motion to suppress, but rather addressed, among other issues, a motion for sanctions relating to the destruction of a law enforcement officer's handwritten notes in violation of *Jenks* and *Brady*. *Id*. at 908-11. The issues addressed in *Mansker* have no relevance to the instant motion to suppress non-custodial statements made to law enforcement. Accordingly, I am unpersuaded by the cases cited by Defendant.

Additionally, Officer Furman's affidavits mentioned that Defendant spoke to Investigator Gilson on March 29, 2021 (in part to avoid arrest on probation violations) and that Defendant was hesitant when talking about "Blood." The fact that Investigator Gilson's report did not also include these additional specific facts does not detract from Investigator Gilson's credibility. There is no evidence in the record that such information was false or that Investigator Gilson omitted (or that Officer Furman added) the information for nefarious purposes. Investigator Gilson also explained that Defendant was not under investigation when they spoke, and Defendant's pending revocation hearing was not a consideration during the interview. Furthermore, Defendant was not arrested. Finally, Investigator Gilson explained that he did not complete a report until well after the March 29, 2021 interview because, at the time of the interview the information provided to him by Defendant regarding the individual selling pills in Marion did not lead anywhere and Investigator considered the matter closed and his involvement

18

done. (Gilson Hr'g Test. at 51.) Apparently, when Investigator Gilson joined the DEA Task Force in January 2022, someone at the DEA asked Investigator Gilson to write a report for the record. (Furman Hr'g Test. at 109-11.) Based on all the foregoing, I find that law enforcement's failure to record the March 29, 2021 interview is not grounds for suppression.

Accordingly, I recommend that the Court find that the meeting between Defendant and Investigator Gilson and Officer Cirkl on March 29, 2021 was not a custodial interrogation and the statements made by Defendant were voluntary.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motions to Suppress. **(Doc. 246.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 23rd day of January, 2023.

_____
Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

19

Case 1:22-cr-00039-CJW-MAR    Document 368    Filed 01/23/23    Page 19 of 19